**SilvermanAcampora LLP**
*Counsel to the Petitioning Creditors*
100 Jericho Quadrangle, Suite 300
Jericho, New York 111753
(516) 479-6300
David J. Mahoney

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
In re:

SRS CAPITAL FUNDS, INC., *a/k/a*　　　　　　Involuntary Chapter 7
SRS CAPITAL FUNDS 2 LLC, *a/k/a*　　　　　　Case No. 8-20-72883 (REG)
SRS CAPITAL FUNDS II, LLC, *a/k/a*
SRS CAPITAL LLC,

　　　　　　Involuntary Debtor.
-----------------------------------------------------------X

## DECLARATION OF ZACKARY DUGOW IN SUPPORT OF PETITIONING CREDITORS' OPPOSITION TO INVOLUNTARY DEBTOR'S MOTION TO DISMISS CASE

Zackary Dugow, pursuant to 28 U.S.C. §1746, declares under penalty of perjury as follows:

1. I am a creditor of SRS Capital Funds, Inc., a/k/a SRS Capital Funds 2 LLC, a/k/a SRS Capital Funds II, LLC, a/k/a SRS Capital LLC ("SRS" or the "Involuntary Debtor").

2. I am also the principal of both Insticator LLC ("Insticator") and Gamified Ads LLC ("Gamified").

3. I submit this Declaration in opposition to the motion of SRS to dismiss the involuntary petition for Chapter 7 I filed with Ari Jacoby ("Jacoby") and Gamified (as the assignee of Insticator).

4. The statements set forth in this declaration are based upon my personal knowledge and information, except those statements which are made upon information and belief, which are made based upon the best information known to me at this time.

**The Dugow Loans**

5. In my personal capacity, I made three (3) loans to SRS. The first, in the amount of $50,000, was made on December 20, 2018 (the "First Dugow Loan"); the second, in the amount of $50,000 was made on March 12, 2019 (the "Second Dugow Loan"); and the third, also in the amount of $50,000 was made on December 26, 2019 (the "Third Dugow Loan"). I may subsequently refer to those three loans collectively as the "Dugow Loans."

6. The First Dugow Loan was made pursuant to an Unsecured Master Loan Agreement, dated December 12, 2018, a copy of which is annexed to this Declaration as **Exhibit A**.

7. I have also annexed as **Exhibit B**, a wire confirmation showing my December 20, 2018 remittance of $50,000 in satisfaction of my obligations under the First Dugow Loan.

8. The Second Dugow Loan was made pursuant to Amendment No. 1 to the Master Loan Agreement, dated February 3, 2019, a copy of which is annexed to this Declaration as **Exhibit C**.

9. I have also annexed as **Exhibit D**, a wire confirmation showing my March 12, 2019 remittance of $50,000 in satisfaction of my obligations under the Second Dugow Loan.

10. The Third Dugow Loan was made pursuant to an undated Unsecured Master Loan Agreement, purportedly between myself as lender and SRS Capital Funds 2 LLC, a copy of which is annexed to this Declaration as **Exhibit E**.

11. Despite the fact that the Third Dugow Loan was purportedly to be made to SRS Capital Funds 2 LLC, I was specifically directed by Joseph Schulman to remit the funds being loaned to the same SRS account where I remitted the first and second Dugow Loans. A copy of the wire confirmation showing my December 26, 2019 remittance of $50,000 to SRS is annexed to this Declaration as **Exhibit F**.

12. I have not received repayment of any portion of the monies I personally lent to SRS.

13. In its motion to dismiss, SRS alleges that my claim is subject to dispute. Based upon the foregoing paragraphs, I submit that there is no genuine dispute regarding my claim against the Involuntary Debtor.

**The Insticator Loans**

14. In my capacity as the managing member of Insticator, I negotiated and authorized three (3) loans from Insticator to SRS. The first, in the amount of $50,000, was made on December 20, 2018; the second, in the amount of $50,000 was made on January 7, 2019; and the third, in the amount of $100,000 was made on November 14, 2019. I may subsequently refer to those three loans collectively as the "Insticator Loans."

15. The First Insticator Loan was made pursuant to an Unsecured Master Loan Agreement and Promissory Note and Supplement to Unsecured Master Loan Agreement, both dated December 12, 2018, copies of which are collectively annexed to this Declaration as **Exhibit G**.

16. I have also annexed as **Exhibit H**, a wire confirmation showing Insticator's December 20, 2018 remittance of $50,000 in satisfaction of Insticator's obligations under the First Insticator Loan.

17. The Second Insticator Loan was made pursuant to Amendment No. 1 to the Master Loan Agreement, dated January 3, 2019, a copy of which is annexed to this Declaration as **Exhibit I**.

18. I have also annexed as **Exhibit J**, a wire confirmation showing Insticator's January 7, 2019 remittance of $50,000 in satisfaction of Insticator's obligations under the Second Insticator Loan.

19. The Third Insticator Loan was made pursuant to an undated Unsecured Master Loan Agreement, purportedly between Insticator as lender and SRS Capital Funds 2 LLC, a copy of which is annexed to this Declaration as **Exhibit K**.

20. Despite the fact that the Third Insticator Loan was purportedly to be made to SRS Capital Funds 2 LLC, Insticator was specifically directed by Joseph Schulman to remit the funds being loaned to the same SRS account where Insticator remitted the first and second Insticator Loans. A copy of the wire confirmation showing Insticator's November 14, 2019 remittance of $100,000 to SRS is annexed to this Declaration as **Exhibit L**.

21. SRS has not returned any portion of the monies Insticator lent to SRS.

## SRS' Material Misrepresentations and Withholding of Material Information

22. SRS made material misrepresentations and withheld material information for the purpose of inducing Dugow to make the second and third Dugow Loans and inducing Insticator to make the Third Insticator Loan.

23. Annexed to this Declaration as **Exhibit M** is a true and correct copy of the civil complaint (the "Cardinal Complaint") filed by SRS, USRS Capital Funds, Inc., Capital Funding JN, Inc., (SRS's chief executive officer) Joseph Schulman, and Tzila Schulman (collectively the "Cardinal Plaintiffs") against Arty Bujan, William Lees, and Cardinal Equity, LLC (the "Cardinal

Defendants") alleging Fraud in the Inducement, Fraud, Breach of Contract, Promissory Estoppel, Breach of Fiduciary Duty, and Conversion relating to investments made by SRS and the other Cardinal Plaintiffs (including monies raised from lenders like Jacoby, Insticator, and me) into Cardinal Equity, LLC.

24. In the Cardinal Complaint, SRS alleges that "in reliance upon [the Cardinal] Defendants' promises" it invested $20,000,000 in Cardinal Equity. *See* **Exhibit M,** at ¶109.

25. SRS further alleges in the Cardinal Complaint that "[d]espite [the Cardinal] Defendants' numerous assurances that the accounts were profitable and defaults were below 12%, SRS's investments with Cardinal suddenly began to show a negative rate of return in August-November 2018. The negative rate of return was first apparent in a spreadsheet provided by Mr. Lees on August 28, 2018." *See* **Exhibit M,** at ¶52.

26. SRS further alleged in the Cardinal Complaint that "[i]n November 2018, when Plaintiffs grew concerned about the apparent downturn in the profitability of their investment, Plaintiffs requested that defendants stop debiting Plaintiff's accounts to make new advances. Defendants nevertheless debited a large amount of money from Plaintiffs' accounts shortly *after* the request was made." *See* **Exhibit M,** at ¶66 (emphasis in original).

27. SRS continued "at a February 13, 2019 meeting between SRS representatives Seth Grossman and Craig Gherman and Cardinal's Arty Bujan and William Lees, Jr., Mr. Bujan and Mr. Lees finally came clean and acknowledged that ***the accounts had not made any net profit in the past two years, and had in fact lost a considerable amount of money.*** " *See* **Exhibit M,** at ¶53 (emphasis in original).

28. SRS had actual knowledge of the Cardinal negative rates of return and Cardinal's unauthorized debiting of funds from SRS's account when it negotiated the First Dugow Loan and the both the first and second Insticator Loans.

29. When SRS negotiated the Third Insticator Loan and the second and third Dugow Loans, it had already procured Mr. Bujan and Mr. Lees' admissions that Cardinal had materially misled SRS about the performance of its investment in Cardinal. Therefore, it had actual knowledge that it lost several million dollars in those investments. SRS knowingly and intentionally misled me (in both my personal capacity and as the managing member of Insticator) regarding the performance and profitability of SRS' investments, thereby inducing me to loan more of my money and Insticator's money to SRS under false pretenses.

**Discovery of the Cardinal Loss**

30. I first became aware of the Cardinal Complaint in early 2020. At that time, I contacted SRS to inquire whether SRS was still solvent and able to make repayment on both the Dugow Loans and the Insticator Loans. I was told that the losses relating to SRS' investments with Cardinal had not affected SRS' solvency and that SRS continued to pay all its debts as they became due.

31. I was immediately skeptical of SRS' assurances of solvency as it alleged in the Cardinal Complaint that it was entitled to compensatory damages of no less than $10,000,000. *See* **Exhibit M, ¶94.**

32. As I understand the SRS business model, loans were procured from lenders like me for the purpose of funding investments, like its investment with Cardinal. As such, each time SRS procured a loan, a corresponding obligation to repay the principal and interest due on that loan was

created. In the event that the corresponding SRS investment defaulted, I am aware of no other legitimate means of repaying the loan obligations incurred to fund that investment.

33. If SRS was, in fact, making payment on account of the loans that funded its Cardinal investments, I did not understand how SRS was able to fund the repayment of those loans.

34. Soon thereafter, as the world shut down in response to the COVID-19 pandemic, SRS notified myself and other lenders that the pandemic was negatively impacting its ability to pay interest or repay principal on outstanding loans. Again, SRS incredibly maintained that its solvency issues were arose solely from the pandemic and were unrelated to its $10,000,000 Cardinal investment loss.

**Insticator's Assignment to Gamified**

35. As set forth in my Declaration regarding the assignment of Insticator's claim to Gamified, Insticator refocused its business model after making the Insticator Loans and no longer engages in similar deals. Insticator assigned its right to collect upon the debt due and owing from SRS so that it could focus on its core business of developing on-line platforms for publisher monetization.

36. Insticator did not assign its rights Gamified for the purpose of commencing an involuntary chapter 7 liquidation against SRS. It was, itself, capable of filing an involuntary claim. The assignment did not create a new creditor where one had not otherwise existed. The assignment was made for the sole purpose of avoiding the distraction of dealing with the SRS bankruptcy case.

37. SRS' contention that Insticator required SRS written approval of the assignment to Gamified is a red herring. SRS withheld material information that, had it been disclosed, would have cause both Insticator and I to terminate our negotiations with SRS, thereby avoiding our

current losses. SRS should not be allowed to hide behind a contract that it negotiated under false pretenses.

38.   However, in the event that this Court determines that Insticator's assignment to Gamified is ineffective, Insticator is prepared to proceed as a petitioning creditor in this bankruptcy case.

**Efforts to Obtain Information**

39.   Over the several months that preceded the filing of the involuntary bankruptcy petition, I and certain other creditors attempted to obtain information regarding the status of the SRS business and its ability to pay its debts. In large part, those efforts were met with steadfast refusals to provide any information.

40.   When we did receive information from SRS, the story was remarkably different depending on conveyor. During a telephone call with Joseph Schulman on or about May 10, 2020, Shulman maintained that due to a default rate that exceeded 90%, SRS had abandoned its business and was preparing for an orderly winddown, collecting outstanding receivables with a skeleton staff. However, during a June 2, 2020 telephone call with SRS' head underwriter, Stephen Lopez, Lopez reported that SRS' default rate was remaining steady at approximately 20%, that SRS was still taking on new investments at a reduced rate of return and that it continued to employ three underwriters for the purpose of taking on new business.

41.   Under those circumstances, I have no confidence that SRS is acting with the transparency needed to conduct its own winddown in the best interest of creditors.

42.   SRS has admitted that it cannot pay its debts. However, SRS has failed to explain why a New York corporation should conduct the winddown of its business through and Israeli *bais din* rather than the Bankruptcy Court.

43. Accordingly, I respectfully ask that this Court deny SRS' motion to dismiss, enter a Chapter 7 Order for Relief and appoint a trustee marshal all remaining assets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st Day of October, 2020.

*Zackary Dugow*
_____
ZACKARY DUGOW