UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

                                                                                    Case No. 20-72883-reg

SRS CAPITAL FUNDS, INC.,
aka SRS CAPITAL FUNDS 2 LLC,                             Chapter 7
aka SRS CAPITAL FUNDS II, LLC,
aka SRS CAPITAL LLC,

Debtor.
----------------------------------------------------------X

## MEMORANDUM DECISION DENYING MOTION TO COMPEL ABANDONMENT

This matter comes before the Court on the motion, pursuant to § 554(b) of the Bankruptcy Code[1] by Aharon and Jennifer Ungar (the "Ungars"), to compel the abandonment of certain property held by the chapter 7 trustee, Allan B. Mendelsohn ("Trustee"). The Ungars argue that approximately $62,000 held in two of the Debtor's bank accounts (the "Account Funds") at the time of the commencement of this bankruptcy case are not property of the estate under § 541. The Ungars argue these accounts were established for their benefit in accordance with the terms of a so-called Syndication Participation Agreement (the "Agreement") entered into by them with the Debtor. As such the Ungars argue that the estate, as a matter of law, has only bare legal title to the accounts and they alone hold the equitable interest in the Account Funds which requires the estate to abandon all claims to them.

In support of their argument, the Ungars reference the Debtor's Statement of Financial Affairs, which identifies the Account Funds as property held for the Ungars. They also point to the Agreement which provides that the Account Funds "are the property of Participant and shall be held for the benefit of Participant[.]" *See* Agreement § 4.2, ECF No. 111-1. Additionally, the

---

[1]        All statutory references in this Decision are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

Ungars argue, testimony provided during a § 341 examination of the Debtor's principal, Spencer Silverman ("Mr. Silverman"), generally supports a finding that the Account Funds are their property. *See* Transcript of 341 Meeting of Creditors (Dec. 8, 2020), ECF No. 132.

The Trustee opposes the motion on the grounds that the Agreement is not, in fact, a true participation agreement but rather is a disguised loan, or alternatively a security. Therefore, the Trustee argues the Ungars have neither legal nor equitable rights to the Account Funds. The Trustee argues the Account Funds are outside the scope of an exception in § 541(d) for certain types of property in which the Debtor holds legal title but not an equitable interest. Further, even if the Ungars did hold true loan participations with the Debtor, the Trustee argues that the Ungars have failed to meet their burden under § 554(b) to trace the Account Funds to the purported loan participations.

The sole issue before the Court is whether the Ungars' interest in the Account Funds is as a matter of law sufficient to satisfy the statutory exception found in § 541(d) such that the subject funds are not property of the estate and must be abandoned by the Trustee. It is undisputed that the Debtor holds legal title to the Account Funds. What is at issue is what rights the Ungars have to the funds. In analyzing this question the Court reviewed the purported Participation Agreement as well as other relevant parts of the record. The Ungars attempt to characterize the Agreement as one where they acquired a direct interest in a loan where the Debtor was the lender and a third party was the borrower. In a traditional participation agreement the Account Funds would constitute the proceeds of loans originated by the Debtor but in which the Ungars owned a fractional share. This is so because a true loan participation would have resulted in a sale to the Ungars of a fractional interest in specific loans originated by the Debtor. However, the Court finds the Ungars did not in fact purchase a participating interest in the underlying loans. Rather

the Ungars acquired a right as set forth in the Agreement to share not directly in the underlying loans but rather in the economic gain or loss of the Debtor. The Ungars have failed to meet their burden of proving that the Account Funds are in fact the proceeds of a true loan participation. On that basis alone, the Court finds that the Account Funds are not excepted from property of the estate under § 541(d) and should not be abandoned at this time.

That leaves open the question: What was the financial arrangement between the Debtor and the Ungars? Assuming there was no true participation arrangement (*i.e.*, sale), there are in this Court's view two remaining alternatives: a loan or sale of a security. Although these two alternatives have been briefed and analyzed by the parties, the Court will not make any determination today other than that the Agreement was not a true participation and therefore the Account Funds are not excepted from property of the estate under § 541(d).

## FACTS

The Debtor was in the business of financing merchant cash advances. Transcript of 341 Meeting of Creditors (Dec. 8, 2020), ECF No. 132, at 13. An involuntary bankruptcy petition was filed against the Debtor on September 4, 2020, and the Court entered an order for relief on October 28, 2020. The Trustee was appointed on November 2, 2020. Thereafter, on July 20, 2021, the Ungars filed the instant Motion to Compel Abandonment of the Account Funds.

I.  The "Syndication Participation Agreement"

The Ungars entered into the Agreement with the Debtor on March 2, 2017 to "co-invest" in various merchant cash advances, revenue based financings, or loans with business borrowers under terms and conditions in the "sole discretion" of the Debtor. Agreement, "Where As" Clause A, B. With the Debtor as "Lead" and the Ungars as "Participant," the Debtor was

authorized "to decide (i) whether or not [the Ungars] will co-invest in a Funding Agreement and (ii) how much of the [Ungars'] Investment shall be allocated to each Funding Agreement in which [the Debtor] elects [the Ungars'] to co-invest. Agreement § 2.2. The Ungars understood "that there are several risks related to co-investment including, but not limited to: (a) the risk that [the Ungars] may lose some or all of [their] Participation Amount and/or Participant Investment; (b) the risk that the Client's [*i.e.*, borrower's] cash flow and assets may not be sufficient to recover the investment amount nor will result in any profit there from; (c) the risk that there may be no guarantee or collateral on the funded amount; and (d) the fact that [the Ungars'] investment may be an unsecured obligation of the Client." *Id.* § 3A.1.4. In the event that the borrowers failed to make good on the various types of credit agreements, "only [the Debtor] has the right to seek and engage in legal recourse against the Client to enforce the terms of any agreements." *Id.* § 3A.1.8. Notably, the Ungars warranted and represented that they were "accredited investor[s]" as defined by Rule 501 under the Securities Act. *Id.* § 3A.1.1. While the agreement was for a 12-month term and renewed automatically, *id.* § 7.1, Ex. A, the "average loan duration is about four (4) months" *id.* § 3B.1.6.

The exact breakdown in the distribution of payments from the various credit products entered into at the Debtor's sole discretion is unclear from the Agreement. The Debtor was only to take a "small share of each deal." *Id.* § 3B.1.3. The Ungars in turn were to be paid a monthly "Participation Payment" within 15 days of the month associated with proceeds from the credit products. *Id.* § 4.2. The Agreement defines "Participation Payment" as "the product of the Funding Agreement Proceeds, multiplied by the Participant Percentage. *Id.* § 1.23. "Funding Agreement Proceeds" is defined as "the product of (i) [the Debtor's] good faith estimate of Collections, subject to reasonable reserve and adjustment as determined by [the Debtor] (which

may be based on, slow payments, refreshes and/or defaults of Client), from the applicable Funding Agreement, less the applicable Funding Agreement Expenses, multiplied by (ii) the Participation Factor." *Id.* § 1.17. The "Participation Factor" is "a fraction, the numerator of which is the Participant Investment and the denominator of which is [the Debtor's] aggregate investment under the applicable Funding Agreement." *Id.* § 1.26. The Participant Investment is $500,000. *Id.* Ex. A. Thus, under the Agreement, that figure over the Debtor's "aggregate investment" in the relevant credit product is multiplied by the collections estimates and adjustments, and then the resulting amount is multiplied by a 50% Participant Percentage referenced in Exhibit A. *Id.* § 1.23, Ex. A.

In summary, the Debtor was to underwrite and originate credit with some unknown proportion of principal coming from the Ungars. The Ungars were to be repaid proportionately based on funds they provided to the Debtor, and based on the Debtor's estimates of and adjustments to payment amounts from its borrowers. The Agreement indicates that the Ungars were to provide funds to the Debtor, and that the Debtor was to determine how to lend out the Ungars' money with "sole discretion" in credit underwriting and origination decisions. Additionally, only the Debtor had the right under the Agreement to enforce the underlying credit agreements against borrowers.

According to the Ungars, they advanced "not less than $1,350,000 to the Debtor." Declaration of Aharon Ungar, ECF No. 111, ¶ 5. However, the record is devoid of any evidence of specific credit transactions in which the Ungars participated.

II.     The Accounts

The Agreement provides for the Ungars' "Participation Payments" to be transferred into a bank account referenced in Exhibit A. Agreement § 4.4. However, the Participant Bank Account section of Exhibit A is blank. Agreement, Ex. A. The Ungars assert that the accounts were set up by the Debtor after they entered into the Agreement. According to the Ungars, two accounts at JPMorgan Chase Bank N.A., ending in account numbers 7913 and 2953 (the "Accounts") were set up to hold the Participation Payments. The funds within those Accounts, as of the date of the Debtor's bankruptcy, in the respective amounts of $24,890.52 and $37,084.20, are the Account Funds at issue in this matter. In the Statement of Financial Affairs, the Debtor identified the Accounts as property held for the Ungars. Official Form 207, Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, Part 11 (Nov. 11, 2020), ECF No. 28. This is further supported by Mr. Silverman's testimony stating that the Accounts were profit-sharing accounts. Transcript of 341 Meeting of Creditors, at 29 (Dec. 8, 2020), ECF No. 132. According to Mr. Silverman, the Debtor "set up a separate bank account" for a few (four or five) people who "were on a profit share basis." Transcript of 341 Meeting of Creditors, at 15 (Dec. 8, 2020), ECF No. 132. Investors with profit sharing accounts were able to access the accounts to track their investments. *Id.* The Ungars claim they were provided separate log in access to independently access the accounts. Declaration of Aharon Ungar, ECF No. 111, ¶ 5.

The Ungars have not introduced any evidence from which the purported participations can be traced to specific loans or to the Accounts.

**LEGAL STANDARD**

"On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b). The party seeking to compel abandonment bears the burden of proving by a preponderance of the evidence that the property is in fact burdensome or of inconsequential value to the estate. *In re Siegel*, 204 B.R. 6, 8 (Bankr. W.D.N.Y. 1996). The Ungars argue that the Account Funds are of inconsequential value to the estate because they are the equitable owners.

Property of the bankruptcy estate generally includes all legal or equitable interests of the debtor in property at the time of a case's commencement. 11 U.S.C. § 541. "However, '[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." *Krohn v. Burton (In re Swift)*, 496 B.R. 89, 96 (Bankr. E.D.N.Y. 2013) (quoting 11 U.S.C. § 541(d));*see also*, *e.g.*, *Corp. Fin., Inc v. Fidelity Nat. Title Ins. (In re Corp. Fin., Inc.)*, 221 B.R. 671, 678 (Bankr. E.D.N.Y. 1998). Thus, the Ungars bear the burden of proving by a preponderance of the evidence that they hold the equitable interest in the Account Funds. *See*, *e.g.*, *In re Oak Rock Fin., LLC*, No. 13-72251-REG, 2014 WL 11070995, at *7 (Bankr. E.D.N.Y. Apr. 10, 2014) (reversed and remanded on separate grounds by *Rothenberg v. Oak Rock Fin., LLC*, No. 14-CV-3700, 2015 WL 10663413 (E.D.N.Y. Mar. 31, 2015)).

## DISCUSSION

The question that follows is whether the Ungars hold an equitable interest in the Account Funds sufficient to (a) except those funds from property of the estate under § 541(d), and therefore (b) support a finding that the funds are of inconsequential value to the estate under § 554(b). In accordance with § 541(d), true loan participants hold the equitable interest in their participation distributions even where it is the debtor who holds legal title to the property. *Oak Rock,* 2014 WL 11070995, at *7 ("The use of the words 'such as' preceding the description of a secondary mortgage market transaction indicates that an interest purchased in such a transaction is only one example of the type of property protected by § 541(d).") (reversed and remanded on separate grounds by *Rothenberg*, 2015 WL 10663413); *see also In re Corp. Fin., Inc.*, 221 B.R. 671, 677-78 (noting that participations in mortgage loans fall within the § 541(d) exception for equitable property interests). "If the agreements are 'true participations,' and thus sales rather than loans, 'then the funds are effectively removed from the *res* of the estate.'*Ratto v. Sims (In re Lendvest Mortgage, Inc.),* 119 B.R. 199, 200 (B.A.P. 9th Cir. 1990) (citing *Fireman's Fund Insurance Companies v. Grover (In re Woodson Co)*, 813 F.2d 266, 271 (9th Cir. 1987))." *Rothenberg*, 2015 WL 10663413, at *7.

When it comes to analyzing the true nature of a financial arrangement this Court may look past form and into substance, disregarding what the parties may call the transaction and inquiring into its true economic realities. *Corp. Fin. Inc.*, 221 B.R. at 682 (citing *In re Sackman Mortgage Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993)); *Rothenberg*, 2015 WL 10663413, at *7 (citing *In re PCH Associates*, 804 F.2d 193, 199 (2d Cir. 1986)); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (noting that economic substance similarly controls over legal

8

formalisms in the context of interpreting the term "security" under the Securities Exchange Act of 1934).

I. **Whether the Ungars' Financial Arrangement with Debtor was a True Loan Participation**

Black's Law Dictionary defines a loan participation as "the coming together of multiple lenders to issue a large loan (called a participation loan) to one borrower, thereby reducing each lender's individual risk." *Loan participation*, BLACK'S LAW DICTIONARY (11th ed. 2019). Courts have articulated four factors (the "*Coronet Capital* factors") for finding a true loan participation, asking whether: (1) money is advanced by participant to a lead lender; (2) a participant's right to repayment only arises when a lead lender is paid; (3) only the lead lender can seek legal recourse against the borrower; and (4) the document evidences the parties' true intentions. *Rothenberg*, 2015 WL 10663413, at *7 (citing *In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992)).

For purposes of a § 541(d) equitable interest analysis, a loan participation is one in which a lead lender originates a loan and then sells an equitable right to payment from that loan while retaining legal title. *See* 11 U.S.C. § 541(d) (describing, as an example of a type of equitable interest excepted from property of the estate, "an equitable interest . . . sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest[.]"); *see also Rothenberg*, 2015 WL 10663413, at *6 ("If the agreements are 'true participations,' and thus sales rather than loans, 'then the funds are effectively removed from *the res* of the estate.'") (quoting *Lendvest*, 119 B.R. at 200 (citing *In re Woodson Co.*, 813 F.2d 266, 271 (9th Cir. 1987))); Debora L. Threedy, *Loan Participations—Sales or Loans? Or is that the Question?*, 68 OR. L. REV 649, 654 ("[I]f the lead has sold an equitable interest in the loan to the participant and merely retains legal title to service the loan, then § 541(d) of the Bankruptcy

Code protects the participant's interest from attack by the trustee. If the participant succeeds, the loan proceeds, to the extent of the participation interest, are beyond the trustee's reach and the participant will receive its pro rata share under the participation agreement."). A true loan participation for purposes of a § 541(d) analysis requires there to be, in effect, a sale of the equitable interest in the relevant underlying credit agreement.

A superficial application of the *Coronet Capital* factors to the language of the Agreement might lead one to find the Agreement to be a true loan participation. First, the Ungars advanced money to the Debtor, who was the lead lender in the credit agreements in which the Ungars were to co-lend. Agreement § 5.1, Ex. A. Second, the Ungars' right to repayment was based on the Debtor's collections on the credit transactions in which the Ungars participated. Agreement § 4.2. Third, only the Debtor could seek legal recourse against the borrowers. Agreement § 3A.1.8. Finally, the Ungars have introduced the Agreement as evidence of their intention to participate in loans initiated by the Debtor.

A closer look at the caselaw reveals two factual predicates to finding true participations: either, (1) the purported participation is entered into to facilitate a specific credit transaction, or (2) the purported participation is entered into to facilitate general lending operations but loan proceeds are segregated and traceable to the underlying loans. Regarding the first alternative, this Court notes that in cases where courts have found a true participation to exist the facts reflect that there is a known and specific borrower and loan in which the participation is sold. *See Coronet Capital*, 142 B.R. at 79-80 (describing a purported participation in a consolidated mortgage loan to *SSD Properties Corp.*); *Rothenberg*, 2015 WL 10663413, at *2-3 (describing a participation in a revolving credit line to *Merchants Advance, LLC and AmeriMerchant LLC*); *Lendvest*, 119 B.R. at 199 (describing a purported participation in a promissory note of

10

borrowers *R.B. Hawkinson and Beth L. Hawkinson* secured by a deed of trust on certain property) (emphasis added); *Sackman*, 158 B.R. at 930-32 (describing a purported participation in notes and mortgages to a partnership called *YPH Associates*) (emphasis added); *Corp. Fin. Inc.*, 221 B.R. at 674 ("Each agreement provided that the investor and the plaintiff were entering into a joint venture for the purpose of funding *a particular mortgage loan* made or to be made by the plaintiff.") (emphasis added).

That is not to say that a participant must always know the exact object of the credit extension the participant facilitates. For example, in *Ryan v. Zinker (In re Sprint Mortgage Bankers Corp.)*, 164 B.R. 224 (Bankr. E.D.N.Y. 1994), the Court noted that the specific properties to be mortgaged were unidentified at the time that the parties entered into the purported mortgage participations but found that to be a true participation the funds must be segregated and the participant must be able to "to track his or her portion of the proceeds to any identifiable funds." *Id.* at 225-29.

The Ungars have made no showing on either of these factual predicates. For one, they had no authority under the Agreement to determine the specific credit agreements in which they were purportedly participating. Agreement § 2.2. The object of their participations could have been one or any number of loans or other types of credit. As for the second alternative, the Ungars have failed to trace the Account Funds to their purported loan participations. While they alleged the Account Funds to include proceeds of underlying credit obligations entered into in accordance with the Agreement, they have introduced no evidence as to the underlying credit agreements from which the proceeds allegedly arose, let alone trace them directly to those credit agreements. That leaves the Court to conclude that the Ungars did not hold true loan participations.

## II. Disguised Loans

The true loan participation test is commonly applied in consort with a test for determining whether a credit investment is in fact a disguised loan. *See*, *e.g.*, *Rothenberg*, 2015 WL 10663413, at *7 (citing *Coronet Capital Co.*, 142 B.R. at 82 and *In re Sprint Mortgage Bankers Corp.*, 164 B.R. 224 (Bankr. E.D.N.Y. 1994)); *see also In re Corp. Fin., Inc.*, 221 B.R. at 678-79.

A financial arrangement that passes the true loan participation test might be found to be a disguised loan if the weight of the following factors is answered in the affirmative: (1) whether there is a guarantee of repayment by the lead lender to a participant; (2) whether the participation lasts for a shorter or longer term than the underlying obligation; (3) whether there are different payment arrangements between the borrower and the lead lender and the lead lender and the participant; (4) whether there is a discrepancy between the interest rate due on the underlying note and the interest rate specified in the participation. *Id.* The first factor is the most significant as it would evidence payment to the investor based solely on the credit risk of the lead lender rather than of the borrowers in whose credit transactions the investor is purportedly participating. *See Rothenberg*, 2015 WL 10663413, at *7 (citing *In re Corporate Financing, Inc.*, 221 B.R. 671 (Bankr. E.D.N.Y. 1998)). The fourth factor is also weighed heavily. *Id.* at *12 (citing *Corporate Financing*, 221 B.R. at 680). Under the fourth factor, an alleged loan participation offering an investor a higher interest rate than that provided for in the underlying credit agreement supports a finding of a disguised loan. *Id.* at *12.

The Court, having already concluded that the Ungars did not hold true participations in loans originated by the Debtor and found that the Ungars' motion should be denied on that basis, need not determine whether the funds advanced to the Debtor by the Ungars were in the nature

of a disguised loan. The Court will note however that the Ungars filed a Proof of Claim in this case in the amount of $1,059,710.96 for "money loaned." As of the date of this Decision no objection to the Ungars' claim has been interposed.

### III.     Investments in Securities

In arguing that the funds they provided to the Debtor were in the nature of a true participation, the Ungars argue that their investment was *not* in the nature of a security despite the fact that the Agreement identifies the Ungars as "accredited investors." They urge this Court to apply the "family resemblance" test adopted by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56 (1990), and find that their investment was not a purchase of a security. The Trustee urges the Court to apply a different test outlined by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

The family resemblance test is the standard for finding a *note* to be a security. *Reves*, 494 U.S. at 64. The *Howey* test only applies if the financial arrangement is not embodied in a note. Although neither test need by applied by the Court today, the Court will set forth the standards under both *Reves* and *Howey*.

### A.     The Family Resemblance Test

The family resemblance test considers four factors for rebutting a presumption that a note is a security: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduced the risk of the instrument. *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51, 55 (2d Cir. 1992) (citing *Reves*, 494 U.S. at 66-67). The test is two-part.

First, a court considers whether, based on the four factors, there is a "strong resemblance between the note and one of a judicially-enumerated list of instruments that are not securities." *Id.* (citing *Reves*, 494 U.S. at 65). Types of notes found not to be securities include notes tied to consumer financings, notes secured by home mortgages, secured short-term loans to small businesses, short-term notes secured by assignments of accounts receivables, and notes formalizing open-account debt incurred in the ordinary course of business. *Reves v. Ernst & Young*, 494 U.S. at 65. Syndicated loans have also been excepted from the definition of securities. *Kirschner v. JPMorgan Chase Bank, N.A.*, 17-CV-6334-PGG, 2020 WL 2614765 (S.D.N.Y. May 22, 2020). Second, "[i]f the note in question is not sufficiently similar to one of these instruments, a court must then consider, using the same four factors, whether another category of non-security instruments should be added to the list." *Banco Espanol*, 973 F.2d at 55 (citing *Reves*, 494 U.S. at 67). In analyzing the factors, the key thread apparent throughout the family resemblance test is whether they weigh in favor of the transaction having been entered into as an "investment in a business enterprise" or alternatively as "a purely commercial or consumer transaction." *Reves*, 494 U.S. at 67-68. If the transaction is more properly construed as an investment, then it will tend to be a security. *Id.*

**B.    The *Howey* Test**

In the event that the Agreement is not a "note" then the question is whether it falls within the definition of the term security as an investment contract. *Reves*, 494 U.S. at 64. In *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court adopted a definition of investment contract from state blue sky laws indicating that an investment contract is one for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *Howey*, 328 U.S. at 298 (citing *State v. Gopher Tire & Rubber Co.*, 177 N.W.

14

937, 938 (Minn. 1920)). Thus, an investment contract is "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of a promoter or third party." *Marino v. Adamo*, 812 F. Supp. 2d 243, 255 (E.D.N.Y. 2011) (quoting *Howey*, 328 U.S. at 298-99). In *Marine Bank v. Weaver*, 455 U.S. 551 (1982), the Supreme Court added an additional element to the definition, specifically, that "for an instrument to be a security the investor must risk loss." *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985)). Regarding the fourth requirement, courts hold that "solely" is not to be strictly construed. *See S.E.C. v. Aqua-Sonic Products*, 687 F.2d 577, 584 (2d Cir. 1982) (holding that the right or even requirement of a generally passive investor to contribute a "modicum of effort" does not prevent a contract from being considered an investment contract and a security).

## CONCLUSION

The Court need not conclude today whether the Agreement embodies a loan or the purchase of a security. The Court need only find that the Ungars have failed to meet their burden of proving by a preponderance of the evidence that the Account Funds should be excepted from property of the estate under § 541(d) and are burdensome or of inconsequential value to the estate under § 554(b). Based on the record before it, the Court finds that the Ungars did not purchase true loan participations.

The Trustee's counsel is directed to submit an order denying the Ungars' motion to compel abandonment consistent with this Memorandum Decision.



Dated: Central Islip, New York
April 13, 2022

Robert E. Grossman
United States Bankruptcy Judge